**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| DANNY SCARDINA, | CASE NO. 1:23-CV-0585-AMK |
| Plaintiff, | |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

Plaintiff Danny Scardina ("Plaintiff" or "Mr. Scardina") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and is before the undersigned pursuant to the consent of the parties.  (ECF Doc. 7.)  For the reasons set forth below, the Court **AFFIRMS** the Commissioner's decision.

## I.      Procedural History

Mr. Scardina protectively filed his DIB application on February 8, 2021, alleging disability beginning November 4, 2019.  (Tr. 77, 163.)  He alleged disability due to: blind or low vision, heart attack, high blood pressure, coronary artery disease, thyroid disease, lumbar disc herniation, right lumbar radiculopathy.  (Tr. 70.)  Mr. Scardina's application was denied at the initial level (Tr. 70-77, 87) and upon reconsideration (Tr. 78-85, 98).  He then requested a hearing.  (Tr. 103-04, 129-134.)

1

On April 1, 2022, a telephonic hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 36-69.)  The ALJ issued an unfavorable decision on April 20, 2022, finding Mr. Scardina had not been under a disability from November 4, 2019, through the date of the decision.  (Tr. 16-35.)  Mr. Scardina requested review of the decision by the Appeals Council (Tr. 157-59), which was denied on January 17, 2023 (Tr. 5-8), making the ALJ's decision the final decision of the Commissioner.  Mr. Scardina then filed this pending appeal (ECF Doc. 1), which is fully briefed (ECF Docs. 9, 11).

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Mr. Scardina was born in 1959 and was 60 years old on the alleged disability onset date. (Tr. 29, 163.)  He has a high school education and some college.  (Tr. 40, 178.)  He is married. (Tr. 42.)  He has past relevant work as a shipping and receiving clerk and a shipping and receiving supervisor.  (Tr. 59-60, 178.)  He last worked in November 2019.  (Tr. 42.)

### B.    Medical Evidence

Although the ALJ identified numerous severe physical and mental impairments (Tr. 22), Mr. Scardina bases his appeal solely on his visual impairments (ECF Doc. 9).  The evidence summarized herein therefore focuses on Mr. Scardina's visual impairments.

#### 1.    Relevant Treatment History

Mr. Scardina's medical impairments include retinal detachment, cataracts, macular edema, cardiomyopathy with a history of angioplasty and stenting, hyperlipidemia, essential hypertension, obesity, and lumbar degeneration.  (Tr. 224-225, 239-242, 274, 288.)

On July 22, 2019, Mr. Scardina presented to Greg Kaye, O.D., at Skyvision Centers ("Skyvision"), for a sudden loss of vision in his left eye.  (Tr. 485-87.)   His eye examination

revealed a visual acuity of 20/25-2 in the right eye (OD) and CF 4 (i.e., able to count fingers at four feet) in the left eye (OS). (Tr. 485.) Examination of the periphery of his left eye revealed a macula-off rhegmatogenous retinal detachment. (Tr. 486.) Dr. Kaye diagnosed a left eye retinal detachment (Tr. 486), counseled Mr. Scardina regarding methods of repair, including vitrectomy surgery (Tr. 487), and referred him to ophthalmologist Scott D. Pendergast, M.D., for further treatment (*Id.*). Dr. Pendergast's subsequent records indicate that Mr. Scardina underwent a pars plana vitrectomy (PPV) retinal detachment repair of the left eye on July 22, 2019.[1] (Tr. 455.)

On November 5, 2019, Mr. Scardina presented to Skyvision with a chief complaint of age-related cataracts in both eyes, status post left retinal detachment repair, and was seen by Darrell White, M.D. (Tr. 488.) He complained of difficulty reading, driving, and seeing street signs. (*Id.*) Examination of the right lens revealed 2+ nuclear sclerosis, and examination of the left lens revealed 2-3+ nuclear sclerosis. (Tr. 489.) Examination of the left eye also revealed epiretinal membrane thickening in the macula and scar tissue below the macula, status post retinal detachment. (*Id.*) Dr. White diagnosed a combined form of senile cataract in both eyes but explained that he felt they should hold off on surgery for a time due to not knowing the full visual potential; but he would be willing to do the surgery if Dr. Pendergast strongly suggested it. (Tr. 490.) He also noted that Mr. Scardina would benefit from a toric implant due to the amount of astigmatism. (*Id.*) As to the history of retinal detachment, Dr. White counseled Mr. Scardina to contact the office if symptoms of retinal detachment recurred after his surgery. (*Id.*)

On February 12, 2020, Mr. Scardina presented to Dr. White for further evaluation and management of his age-related cataracts. (Tr. 491-94.) He complained of difficulty driving, difficulty reading and seeing street signs, seeing halos, and having nighttime glare. (Tr. 491.)

---

[1] Medical records for the surgery itself do not appear in the evidentiary record.

His visual acuity with glasses was 20/20 on the right (OD) and 20/50 on the left (OS).  (*Id.*)
Other examination findings were similar to his November 2019 examination.  (*Compare* Tr. 492
*with* Tr. 489.)  After discussion with Dr. White, Mr. Scardina agreed to proceed with a toric
intraocular lens (IOL) implant in his right eye, and cataract surgery with an IOL and toric IOL in
his left eye; the procedure for the left eye was to be performed first.  (Tr. 493).

      Dr. Pendergast's records indicate that he performed an epiretinal membrane removal with
intravitreal Kenalog (IVK) on Mr. Scardina's left eye on February 26, 2020.[2]  (Tr. 455.)

      Dr. White performed a cataract extraction with IOL implant on the left eye on May 7,
2020.  (Tr. 499-501.)  Mr. Scardina attended post-operative visit with Sara Schoech, O.D., that
same day, reporting blurry vision in left eye, but no pain, discharge, or redness.  (Tr. 497-98.)

      Mr. Scardina returned to see Dr. Kaye on May 13, 2020, for further evaluation and
management of the age-related cataract in his right eye and post-operative follow up following
the cataract extraction with IOL (with toric) in his left eye.  (Tr. 502-05.)  He complained of
feeling unbalanced since his cataract surgery, with one eye having a cataract and the other having
an IOL; it felt like his eyes were not working together.  (Tr. 502.)  He continued to report no
pain, discharge, or redness in the left eye.  (*Id.*)  Mr. Scardina was instructed to continue post-
operative treatment for the left eye and to begin pre-operative eye drops for the right eye, and a
cataract extraction was scheduled for the right eye.  (Tr. 504.)

      Dr. White performed a cataract extraction with IOL implant on the right eye on May 21,
2020.  (Tr. 506-08.)  Mr. Scardina attended a post-operative visit with Dr. Kaye the next day, on
May 22, 2020.  (Tr. 509-10.)  His examination without correction revealed visual acuity of 20/25
in the right eye (OD) and 20/40 in the left eye (OS). (Tr. 509.)  At a post-operative follow up

---

[2] Medical records for the procedure itself do not appear to be included in the evidentiary record.

with Dana Griesmer, O.D., on May 26, 2020 (Tr. 511-13), his visual acuity was 20/25 -2 in the right eye (OD) and 20/50 in the left eye (OS) (Tr. 511).  His condition was stable, but he reported that his vision was cloudy in the right eye and the eye was occasionally irritated.  (*Id.*)  When he returned for another post-operative visit with Dr. Griesmer on June 12, 2020, he reported that his vision was worse, very foggy in the right eye.  (Tr. 514-16.)  His vsual acuity without correction was 20/40 in the right eye (OD) and 20/50 in the left (OS).  (Tr. 514.)

Mr. Scardina returned to see Dr. White on June 17, 2020, reporting he was not satisfied with his visual outcome following cataract surgery; after initial improvement following surgery, he felt his vision had decreased and was poor.  (Tr. 517-19.)  His visual acuity was 20/50 in the right eye (OD) and 20/60 in the left (OS).  (Tr. 517.)  Dr. White diagnosed cystoid macular edema of the left eye and referred Mr. Scardina to Dr. Pendergast for treatment.  (Tr. 518.)

Mr. Scardina followed up with Dr. White regarding his cystoid macular edema on July 29, 2020, reporting his vision improved after he received a left eye injection from Dr. Pendergast on July 27, 2020; he was scheduled to see Dr. Pendergast again on August 18, 2020.[3]  (Tr. 520-22.)  His visual acuity was 20/25 +2 in the right eye (OD) and 20/50 in the left eye (OS).  (Tr. 520.)  Examination of his left eye also revealed mild scar tissue from the retinal detachment repair in the macula and inflamed choroidal scarring.  (Tr. 521.)  Dr. White continued the referral to Dr. Pendergast at Retina Associates for cystoid macular edema of the left eye.  (Tr. 522.)

Mr. Scardina returned to see Dr. White on January 29, 2021, for follow up regarding his cataract surgeries and his cystoid macular edema of the left eye.  (Tr. 523-25.)  He reported that his vision was stable in the right eye but was no better in the left eye.  (Tr. 523.)  He continued to receive intravitreal injections and was scheduled to see Dr. Pendergast on February 1, 2021; his

---

[3] It does not appear that Dr. Pendergast's treatment records for these procedures are in the evidentiary record.

left eye vision continued to be blurred.  (*Id.*)  On examination, his visual acuity with glasses was 20/25 in the right eye (OD) and 20/150 in the left eye (OS).  (*Id.*)  The examination revealed 2+ posterior capsular opacification on the right and 2-3+ posterior capsular opacification on the left. (Tr. 524.)  His left eye examination was positive for mild scar tissue in the macula, inflamed choroidal scarring, and cystoid macular edema.  (*Id.*)  Dr. White continued the referral to Retina Associates for cystoid macular edema of the left eye.  (Tr. 524-25.)  He also noted that Mr. Scardina's bilateral posterior capsular opacification was worsening, and that Mr. Scardina "need[ed] Capsulotomy after seeing Pendergast."  (Tr. 525.)

Mr. Scardina next returned to see Dr. White on March 3, 2021, for follow up regarding posterior capsule opacification involving the left eye.  (Tr. 280-82.)  He complained of difficulty seeing street signs, difficulty seeing the television, and having distorted vision.  (Tr. 280.)  His visual acuity was 20/25 on the right (OD) and 20/200 +1 on the left (OS).  (*Id.*)  His examination revealed 2+ posterior capsular opacification on the right and 3+ posterior capsular opacification on the left.  (*Id.*)  Following consultation with Dr. White, a YAG laser posterior capsulotomy was planned for the left eye; continued observation was planned for the right eye.  (Tr. 281.)  Dr. White continued the referral to Retina Associates for left cystoid macular edema.  (*Id.*)

On March 27, 2021, Mr. Scardina attended an overdue follow-up with Dr. Pendergast at Retina Associates to address worsening pseudophakic cystoid macular edema and posterior capsular haze of the left eye.  (Tr. 454-56.)  Visual acuity was 20/20 in the right eye (OD) for near and distance vision, and 20/80 in the left eye (OS) for distance vision and 20/70 for near vision.  (Tr. 454.)  Dr. Pendergast noted that Mr. Scardina had a history of macula off retinal detachment, underwent removal of a severe epiretinal membrane about a year prior, and had "a history of chronic pseudophakic cystoid macular edema for which he has responded fairly well to

intravitreal Triesence." (Tr. 455.)  He also noted that Mr. Scardina was status post YAG capsulotomy and felt that the quality of his vision was better. (*Id.*)  The cystoid macular edema present on the last scan had resolved as expected, and Mr. Scardina was doing well since his last Triesence injection two months prior. (*Id.*)  Mr. Scardina asked why his left eye vision was not better, and Dr. Pendergast explained that it was because he had a macula off retinal detachment, a severe epiretinal membrane, and chronic pseudophakic cystoid macular edema. (Tr. 455-56.)

Mr. Scardina returned to see Dr. Pendergast on May 24, 2021, for follow up on improving pseudophakic cystoid macular edema of the left eye (OS). (Tr. 451-53.)  His visual acuity for distance was 20/25+ on the right (OD) and 20/200 on the left (OS), 20/100 +1 with pinhole testing. (Tr. 451.)  Examination of his left eye revealed 2+ cystoid macular edema and resolved mild epiretinal membrane. (Tr. 452.)  His left macular edema was noted to be worsening and an injection was recommended; he received an intravitreal Triesence injection to the left eye and was instructed to follow up in four weeks. (Tr. 452-53.)

He returned for an unscheduled visit with David G. Miller, M.D., at Retina Associates on May 27, 2021, complaining of moderate pain in his left eye, with a red eye and oozing white. (Tr. 448-50.)  Examination of the left eye revealed a subconjunctival hemorrhage at the injection site. (Tr. 449.)  Dr. Miller diagnosed conjunctivitis of the left eye, started Oculfox drops, and instructed Mr. Scardina to return in two days. (*Id.*)  On May 29, 2021, Mr. Scardina followed up with Michael Novak, M.D., at Retina Associates regarding conjunctivitis and worsening macular edema of the left eye. (Tr. 445-47.)  He complained of mild pain / tenderness and hazy vision since his injection. (Tr. 445.)  His visual acuity was 20/20 on the right (OD) and 20/50 -1 on the left (OS). (*Id.*)  Dr. Novak increased his prednisolone dosage for conjunctivitis of the left eye and instructed him to follow up with Dr. Pendergast in one week. (Tr. 446.)

Mr. Scardina followed up with Dr. Pendergast on June 5, 2021, for conjunctivitis and macular edema of his left eye.  (Tr. 442-44.)  He complained of blurred vision, moderate in the left eye and mild in the right.  (Tr. 442.)  His visual acuity was 20/20 on the right (OD) and 20/70 on the left (OS), and 20/50 with pinhole testing on the left.  (*Id.*)  Dr. Pendergast indicated that the left eye macular edema had completely resolved since the last intravitreal Triesence injection for chronic, recurrent pseudophakic cystoid macular edema, and that Mr, Scardina's vision had improved back to baseline.  (Tr. 443.)  As to his conjunctivitis, Dr. Pendergast noted that it was resolving and stable, and gave instructions for continued medications; he suspected Mr. Scardina had a reaction to the betadine used during his last injection.  (*Id.*)  Mr. Scardina stated that his eye felt more or less normal.  (*Id.*)  He was instructed to return in six to eight weeks.  (*Id.*)

Mr. Scardina next followed up with Dr. Pendergast on July 26, 2021, complaining of blurred vision, moderate on the right and mild on the left, and occasional flashes and floaters on the left.  (Tr. 539-41.)  His near and distance visual acuity was 20/20 on the right (OD).  (Tr. 539.)  Near acuity was 20/40 on the left (OS), and distance acuity was 20/80.  (*Id.*)  Examination of the right eye revealed 2+ posterior capsular haze.  (Tr. 540.)  Examination of the left eye revealed 2+ cystoid macular edema.  (*Id.*)  Dr. Pendergast diagnosed worsening macular edema of the left eye and posterior capsular haze of the right eye.  (*Id.*)  He recommended and performed an intravitreal Triesence injection of the left eye for macular edema.  (Tr. 540-41.)  As to the posterior capsular haze of the right eye, Dr. Pendergast noted that Mr. Scardina had complained of intermittent blurring and glare in his better seeing right eye, which had fairly significant opacification of the posterior capsule; he advised Mr. Scardina to discuss undergoing a YAG capsulotomy at his upcoming appointment with Dr. White.  (Tr. 541.)

On August 10, 2021, Dr. White performed a YAG laser posterior capsulotomy of the right eye to address Mr. Scardina's posterior capsular opacification.  (Tr. 543).  At a post-operative follow up on August 18, 2021, Mr. Scardina complained that his vision seemed cloudy, although his vision had seemed improved shortly after the surgery.  (Tr. 545.)  His right eye visual acuity was measured at 20/25-1.  (*Id*.)  Dr. White noted that his visual acuity was improved following surgery and recommended that he return in six months.  (Tr. 546.)

Mr. Scardina returned to Dr. Pendergast on August 23, 2021, for follow up on macular edema in the left eye and posterior capsular haze in the right.  (Tr. 535-37.)  He complained of blurred vision, moderate on the left and mild on the right, with flashes and floaters on the left.  (Tr. 535.)  Visual acuity in the right eye (OD) was 20/25 -2 for distance and 20/30 -1 for near vision.  (*Id*.)  Visual acuity on the left (OS) was 20/60 +2 for distance, 20/50 -2 pinhole, and 20/70 for near vision.  (*Id*.)  Mr. Scardina's pseudophakic cystoid macular edema of the left eye was noted to be improving.  (Tr. 536.)  He was instructed to return in two months.  (Tr. 537.)

Mr. Scardina next attended a follow up appointment with Dr. Pendergast on October 25, 2021, continuing to complain of blurred vision, moderate on the left and mild on the right, and infrequent floaters in the left eye.  (Tr. 554.)  His visual acuity in the right eye (OD) was 20/25 for near and distance.  (*Id*.)  Visual acuity in the left eye (OS) was 20/70 for distance and 20/100 for near vision.  (*Id*.)  Dr. Pendergast recommended and administered an intravitreal Triesence injection in the left eye and instructed Mr. Scardina to return in four weeks.  (Tr. 555-56.)

He returned to see Dr. Pendergast on November 22, 2021.  (Tr. 550-52.)  His visual acuity was 20/25 on the right, for near and distance vision.  (Tr. 550.)  Visual acuity on the left was 20/80 for distance vision and 20/60 for near vision.  (*Id*.)  Examination of the left eye revealed that 2+ cystoid macular edema had resolved.  (Tr. 551.)  Dr. Pendergast noted that Mr.

Scardina has a history of chronic recurrent cystoid macular edema in his left eye, but that his edema had nearly completely resolved since a Triesence injection four weeks prior.  (Tr. 551-52.)  He recommended observation and a return visit in two months; Mr. Scardina was to continue with Prednisolone Acetate and Ketorolac as maintenance therapy.  (Tr. 552.)

Mr. Scardina's next follow up with Dr. Pendergast was on February 7, 2022.  (Tr. 579-81.)  Visual acuity in right eye was 20/25 for distance and 20/20 for near vision.  (Tr. 579.)  Visual acuity in the left eye was 20/100 for distance and 20/400 for near vision.  (*Id.*)  Examination of the left eye revealed increased 2+ cystoid macular edema.  (Tr. 580.)  Dr. Pendergast recommended and administered an intravitreal Triesence injection in the left eye, and instructed Mr. Scardina to return in four weeks.  (Tr. 580-81.)

On February 16, 2022, Mr. Scardina attended a six-month follow up with Dr. Miller for his August 2021 YAG capsulotomy of the right eye.  (Tr. 582-83.)  He complained that his vision in his right eye was occasionally cloudy.  (Tr. 582.)  He reported that he continued to see Dr. Pendergast for left eye injections, including an injection the week before, and inquired whether there were permanent solutions available for the left eye macular edema rather than injections.  (*Id.*)  Visual acuity was 20/25 in his right eye (OD) and 20/150 in his left eye (OS).  (Tr. 582.)  Dr. Miller instructed Mr. Scardina to continue treating at Retina Associates for his cystoid macular edema of the left eye.  (Tr. 583.)

### 2.    Opinion Evidence

#### i.    Consultative Examiner

Dariush Saghafi, M.D., a consultative examiner and internist at Parma Neurology, examined Mr. Scardina on May 19, 2021.  (Tr. 397-399).  Dr. Saghafi's impression was a left retinal tear due to a lifting injury with left eye blindness, and removal of a right eye cataract with

intraocular lens placement. (Tr. 399.) He measured Mr. Scardina's visual acuity at 20/40 with correction, but 20/50 on the right (OD) and 20/200 on the left (OS). (Tr. 398.) His physical examination findings were unremarkable. (Tr. 398-99.) X-rays of the left knee and lumbar spine were obtained, showing mild joint space narrowing of the left knee medial compartment and moderate degenerative changes at L4-L5 and L5-S1. (Tr. 406, 408). Dr. Saghafi concluded that Mr. Scardina can lift, push, and pull sufficiently to perform activities of daily living and lift up to 20 pounds. (Tr. 399.) He also noted that Mr. Scardina's visual acuity at the examination "suggest[ed] that the left eye can be considered at least legally blind." (*Id.*)

### ii.     State Agency Consultant Opinions

On May 21, 2021, state agency medical consultant Lynne Torello, M.D., reviewed Mr. Scardina's medical records, including his Skyvision records through March 2021 (Tr. 71-72), and completed a physical RFC assessment (Tr. 73-74). She opined that Mr. Scardina could: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for six hours in an eight-hour day; sit for six hours in an eight-hour day. (*Id.*) However, she opined that he was also subject to the following limitations: "limited" on the left for near acuity, far acuity, depth perception, accommodation, color vision, and field of vision; should avoid concentrated exposure to extreme cold and extreme heat; and should avoid all exposure to workplace hazards such as unprotected heights, dangerous machinery, and commercial driving due to "poor vision on [left]." (Tr. 74.)

Upon reconsideration, on September 5, 2021, state agency medical consultant Mehr Siddiqui, M.D., reviewed the updated medical records, including Skyvision records through August 2021 (Tr. 80-81), and affirmed Dr. Torello's physical RFC assessment (Tr. 82-83).

C.      **Hearing Testimony**

1.      **Plaintiff's Hearing Testimony**

At the April 1, 2022 hearing, Mr. Scardina testified that he lived with his wife, and that his kids were off at college.  (Tr. 42.)  He had a driver's license.  (*Id*.)  During a typical day, he performed housework, cut the grass, cleaned out the garage, cleaned the basement, and did some laundry.  (Tr. 46.)  Mr. Scardina volunteered 3-4 hours a week for an organization for cerebral palsy.  (Tr. 47.)  His hobby was wine making.  (Tr. 47-48.)

Mr. Scardina applied for disability because of eye problems.  (Tr. 48-49.)  His lack of depth perception made it hard to drive and would make it unsafe to do his past warehouse work. (Tr. 49.)  Mr. Scardina had a hard time seeing things and he got shots in his eyes every 3 months, which would require two days off work for each treatment.  (*Id*.)  He could not read anything on television or from books using his left eye, which became swollen, tired, and bloodshot throughout the day.  (Tr. 50.)  He explained that "[a]ll the work is truly done on the right eye." (*Id*.)  He did not wear an eye patch on his left eye, except right after surgery.  (Tr. 50-51.)

Mr. Scardina has had a heart condition since having a heart attack at age seventeen,[4] and he had to take breaks when doing chores.  (Tr. 51.)  He could lift 20-30 pounds but at that weight it caused a pressure feeling in his eye.  (Tr. 53.)  His neighbors helped him with the buckets of wine for winemaking.  (*Id*.)  He did not go to the store because he had a hard time seeing, and he could use a cellphone or computer, but he had a hard time seeing things well.  (Tr. 55-56.)  He had lower back pains that came and went.  (Tr. 56.)  Due to back pain, he could sit for 1 hour, stand for 2 hours, and walk a lap around the block for 15-20 minutes.  (Tr. 57.)  He took medications for his blood pressure.  (Tr. 58.)

---

[4] The undersigned notes a discrepancy in the hearing transcript wherein Mr. Scardina's testimony was recorded as stating that he had a heart attack "at 17" while the ALJ later referred to his "heart condition from 2017."  (Tr. 51.)

### 2.      Vocational Expert's Hearing Testimony

A Vocational Expert ("VE") also testified at the hearing.  (Tr. 60-67.)  The VE classified

Mr. Scardina's past work as follows: shipping and receiving clerk, a skilled occupation with an

SVP of 5, classified at medium exertion but performed at very heavy; and shipping and receiving

supervisor, a skilled occupation with an SVP of 6, classified at light but performed at very heavy.

(Tr. 59.)  The VE then testified that a hypothetical individual of Mr. Scardina's age, education,

and work experience, with the functional limitations described in the ALJ's RFC determination,

could not perform Mr. Scardina's past work but could perform unskilled medium exertional jobs

such as: dishwasher, packager, and cleaner.  (Tr. 60-61, 64-65.)

With respect to the RFC's provision that the hypothetical individual would be "limited to

performing jobs that can be performed with a patch on one eye," the VE explained that the DOT

does not specifically address "monocular vision," and that his testimony regarding available jobs

was therefore based on his training and experience.  (Tr. 61.)  To further clarify the hypothetical,

the ALJ noted that the hypothetical language relating to a "patch on one eye" meant "no left-eye

accommodation, no depth perception, no far or near acuity on the left eye, no field of vision on

the left eye, and no color vision on the left eye."  (Tr. 63.)  The VE responded: "Well, Your

Honor, when you said a patch, those things were inclusive."  (*Id.*)

### III.      Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments

depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

13

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[5] *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

---

[5] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (*i.e.*, 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.    The ALJ's Decision

The ALJ made the following findings in his August 20, 2021, decision:[6]

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.  (Tr. 21.)

2.      The claimant has not engaged in substantial gainful activity since November 4, 2019, the alleged onset date.  (*Id*.)

3.      The claimant has the following severe impairments: retinal detachments, cardiomyopathy, hyperlipidemia, essential hypertension, obesity, and lumbar degeneration.  (Tr. 22.)

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id*.)

5.      The claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. § 404.1567(c) except: He can occasionally lift and carry 50 pounds and frequently lift and carry 25 pounds. He can sit for 6 hours of an 8-hour workday. He can stand or walk for 6 hours in an 8-hour workday. He can push and pull within the lifting and carrying limitations. His vision is limited to jobs that can be performed with a patch on one eye. He can never work at unprotected heights, around dangerous moving machinery, or perform commercial driving. (Tr. 23.)

6.      The claimant is unable to perform any past relevant work.  (Tr. 29.)

7.      The claimant was born in 1959 and was 60 years old, which is defined as an individual closely approaching retirement age, on the alleged disability onset date.  (*Id*.)

8.      The claimant has at least a high school education.  (*Id*.)

9.      Transferability of job skills is not material to the determination of disability.  (*Id*.)

---

[6] The ALJ's findings are summarized.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including assembler, inspector, and hand trimmer.  (Tr. 30.)

Based on the foregoing, the ALJ determined that Mr. Scardina had not been under a disability, as defined in the Social Security Act, from November 4, 2019, through the date the decision.  (Tr. 31.)

## V.      Plaintiff's Arguments

Mr. Scardina raises two assignments of error in his appeal, both challenging the RFC limitations relating to his visual impairments.  First, he argues that the ALJ lacked substantial evidence to support the limitation to jobs that can be performed with a patch on one eye, arguing the limitation was not based on medical evidence or a medical opinion.  (ECF Doc. 9, pp. 1, 8-9.) Second, he argues that the RFC lacked the support of substantial evidence because it failed to adequately address the limitations resulting from his right eye impairments.  (*Id.* at pp. 1, 9-11.)

## VI.      Law & Analysis

### A.      Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "'build an accurate and logical bridge between the evidence and the result.'"  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      Whether the RFC Limitations Relating to Plaintiff's Visual Impairments Were Supported by Substantial Evidence**

Mr. Scardina argues that the visual restrictions in the RFC are not supported by substantial evidence for two reasons: (1) the limitation to jobs that can be performed with an eye patch is not based upon the medical records or medical opinions; and (2) the RFC fails to adequately address his right eye impairments.  (ECF Doc. 9, pp. 8-11.)  The Commissioner argues in response that Mr. Scardina's visual limitations are adequately accounted for in the RFC, which has the support of substantial evidence.  (ECF Doc. 11, pp. 5-9.)

**1.      Legal Framework for Determining RFC**

A claimant's RFC "is the most [he] can still do despite [his] limitations."  20 C.F.R. § 416.945(a)(1).  An ALJ is charged with assessing a claimant's RFC "based on all the relevant evidence in [the] case record."  *Id.*; *see also* 20 C.F.R. § 416.946(c) "(If your case is at the administrative law judge hearing level . . ., the administrative law judge . . . is responsible for assessing your residual functional capacity.");  *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician.").  Therefore, an ALJ "does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a[n] [RFC] finding."  *Poe*, 342 F. App'x at 157.

An ALJ is "not required to recite the medical opinion of a physician verbatim in his [RFC] finding."  *Poe*, 342 F. App'x at 157.  Indeed, the Sixth Circuit has "rejected the argument that a[n] [RFC] determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ."  *See Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018) (citing *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442–43 (6th Cir. 2017); *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013)).

The court has observed that requiring an ALJ to base an RFC on a medical opinion would effectively confer on medical providers "the authority to make the determination or decision about whether an individual is under a disability," which "would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." *Rudd*, 531 F. App'x at 728 (internal quotation and citation omitted).

The Sixth Circuit has also recognized that it is within an ALJ's "discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001); *Landsaw v. Sec'y of Health & Hum. Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("[T]he regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination."); *see also Cox v. Comm'r of Soc. Sec.*, 615 F. App'x 254, 263 (6th Cir. 2015) (finding an "ALJ's duty to develop the record" does not necessarily "require the ALJ to order a consultative examination").

### 2. First Assignment of Error: Whether "Eye Patch" Limitation Was Supported by Substantial Evidence

The vision limitations adopted by the ALJ in the RFC included the following:

> His vision is limited to jobs that can be performed with a patch on one eye. He can never work at unprotected heights, around dangerous moving machinery, or perform commercial driving.

(Tr. 23.)  Mr. Scardina argues first that the RFC limitation to "jobs that can be performed with a patch on one eye" was not supported by substantial evidence because the ALJ "substituted his lay opinion for medical opinions in the record," "insufficiently identif[ied] the limitations associated with poor vision and the use of an eye patch," and "ignored specific medical opinions and attempted to interpret raw data when he found that an eye patch would essentially correct [the] visual limitations, and allow work activity."  (ECF Doc. 9, p. 8.)  In support, he argues that

the RFC limitations "ignore" the medical opinions of the state agency medical consultants, and that the medical records do not support a finding that Mr. Scardina needed to use an eye patch. (*Id.* at pp. 8-9.)  The Court does not find these arguments to be well taken.

The state agency medical consultants, Drs. Torello and Siddiqui, both opined that Mr. Scardina was subject to the following vision limitations: "limited" on the left for near acuity, far acuity, depth perception, accommodation, color vision, and field of vision; and should avoid all exposure to workplace hazards such as unprotected heights, dangerous machinery, and commercial driving.  (Tr. 74, 83.)  The ALJ acknowledged these opinions, found them to be persuasive (Tr. 28), and adopted an RFC limiting Plaintiff to jobs "that can be performed with a patch on one eye" and never require exposure to unprotected heights, dangerous moving machinery, or commercial driving (Tr. 23).  In testifying regarding the restriction to "jobs that can be performed with a patch on one eye," the VE explained that this amounted to a limitation to jobs that can be performed with "monocular vision."  (Tr. 61.)  When the ALJ offered a more detailed recitation of limitations associated with monocular vision—including "no left-eye accommodation, no depth perception, no far or near acuity on the left eye, no field of vision on the left eye, and no color vision on the left eye"—the VE testified that a limitation to jobs that can be performed with "a patch" would include all of those restrictions.  (Tr. 63.)

Thus, the ALJ adopted RFC limitations for Mr. Scardina's vision impairments that encompassed all the areas of limitation identified in the state agency opinions—i.e., acuity, depth perception, accommodation, color vision, and field of vision—but addressed those limitations in a way that was more specific than the consultants' finding that Mr. Scardina was "limited" in those areas.  Accordingly, the record does not support a finding that the ALJ ignored or failed to account for the opinions of the state agency consultants in adopting the RFC.

As to the argument that the ALJ erred because he did not "specify . . . the origin of the recognition of the need for an eye patch," (ECF Doc. 9, at p. 9), this argument relies on a misreading of the RFC.  As the VE acknowledged in his testimony, the limitation to jobs that can be performed with a patch on one eye equated to a limitation to jobs that can be performed with "monocular vision," i.e., vision with no depth perception, no near or far acuity on the left, no left-eye accommodation, no field of vision on the left, and no color vision on the left.  (Tr. 61, 63.)  For such limitations to be supported by substantial evidence, it need not be established that Mr. Scardina needed an eye patch.  Instead, substantial evidence must support a finding that "the most [Mr. Scardina] can still do despite [his] limitations," 20 C.F.R. § 416.945(a)(1), is perform job tasks that require no more than monocular vision.  Mr. Scardina has not met his burden to show that the ALJ lacked substantial evidence to support such a finding.

In support of his decision to adopt this RFC limitation, the ALJ provided a detailed discussion of the medical records regarding Mr. Scardina's treatment for retinal detachment of the left eye, age-related cataracts, posterior capsular opacification, and cystoid macular edema, specifically discussing the visual acuity measures for the right and left eyes throughout the relevant period.  (Tr. 24-26.)  Visual acuity of the right eye, as identified by the ALJ, usually ranged between 20/20 and 20/25, but sometimes measured at 20/50.  (*Id.*)  In contrast, visual acuity of the left eye, as identified by the ALJ, ranged from 20/40 to 20/200.  (*Id.*)  The ALJ also noted that the consultative examiner measured visual acuity on the left at 20/200 and remarked that the findings suggested the left eye could be considered legally blind, and additionally found the state agency medical consultants' opinions regarding the left eye limitations to be persuasive and consistent with the medical evidence.  (Tr. 27-28.)  Indeed, Mr. Scardina testified that all of the work was done with his right eye.  (Tr. 50.)  A review of the ALJ decision and the evidence

in the record thus supports a finding that the RFC limitation to jobs that can be performed with a patch on one eye was supported by substantial evidence.

For the reasons set forth above, the Court finds that Mr. Scardina has not met his burden to show that the ALJ lacked substantial evidence to support his RFC limitation to jobs that can be performed with a patch on one eye.  Accordingly, the Court finds Mr. Scardina's first assignment of error is without merit.

### 3.    Second Assignment of Error: Whether ALJ Erred by Not Adequately Addressing Right Eye Impairments in RFC

In his second assignment of error, Mr. Scardina argues that the ALJ "failed to provide the necessary nexus between the Plaintiff's right eye visual limitations and the [RFC] determination."  (ECF Doc. 9, p. 11.)  In support, he cites to some of his subjective complaints regarding blurry, cloudy, and hazy vision and medical treatments for his right eye that included: (1) a cataract extraction with toric implant in May 2020; and (2) a laser posterior capsulotomy to address posterior capsular opacification in August 2021.[7]  (*Id.* at p. 10.)  The Commissioner argues in response that Mr. Scardina is improperly asking this court to reweigh the evidence, where "the evidence Plaintiff cites establishes that, while he had serious problems with his left eye, he had mild problems with his right eye."  (ECF Doc. 11, pp. 7-8.)

A review of the ALJ decision reveals that the ALJ considered Mr. Scardina's subjective complaints regarding his vision, including reported difficulties with watching television, reading, and using a cellular phone or computer, but also considered that his reported activities included housework, cutting the grass, cleaning the garage and basement, doing laundry, volunteering,

---

[7] Mr. Scardina's conclusory assertion that an eye specialist must evaluate his right eye to adequately determine the RFC is inadequately developed and is deemed waived.  *See Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006); *see also McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

and wine making.  (Tr. 24.)  The ALJ then provided a detailed discussion of Mr. Scardina's

medical treatment records for his vision impairments, including treatment for a retinal

detachment of the left eye, cataract surgery on both eyes, repeat injections for cystoid macular

edema of the left eye, and a YAG capsulotomy to treat posterior capsular opacification of the

right eye.  (Tr. 24-26.)  As to the cataract surgery for the right eye, the ALJ detailed some

complaints and reduced visual acuity after the surgery, but also noted that visual acuity on the

right was measured at 20/25 within a few months after the surgery.  (Tr. 25.)  As to the YAG

capsulotomy, the ALJ again detailed numerous subsequent examinations that measured Mr.

Scardina's visual acuity at 20/25 following the procedure.  (Tr. 26.)  The ALJ also considered the

medical opinion evidence and found persuasive the state agency medical consultants' opinions

that Mr. Scardina should avoid all exposure to hazards and commercial driving and had

additional limitations relating to the vision in his left eye.  (Tr. 28.)  After making those findings

and observations, the ALJ explained that he found Mr. Scardina's subjective complaints to be

only partially consistent with the record, observing specifically:

> The claimant stated that his vision is worse.  Recent visual acuity testing was 20/25
> in OD [right eye] and 20/150 in OS [left eye].  The claimant has a driver's license
> and he is still able to drive during the day.  . . .  No treating source refers to the
> claimant as having incapacitating or debilitating symptoms that would prevent him
> from returning to the workplace or has otherwise described the claimant as "totally
> and permanently disabled" by his impairments and complaints.  In summary, the
> evidence does not corroborate the claimant's allegations of symptoms attributed to
> his impairments to an extent that would preclude the performance of work with the
> restrictions stated [in the RFC].

(Tr. 28-29.)  Thus, the ALJ provided a detailed discussion of Mr. Scardina's complaints, daily

activities, medical treatments, and the medical opinion evidence before determining—consistent

with the opinions of the state agency medical consultants—that Mr. Scardina was unable to

perform work that required exposure to specified hazards or commercial driving due to his visual

impairments and had additional limitations relating to his ability to use his left eye.  Thus, Mr.

Scardina has not met his burden to show that the ALJ failed to account for his right eye vision impairments, or that the RFC determination lacked the support of substantial evidence.

For the reasons set forth above, the Court finds that Mr. Scardina has not met his burden to show that the ALJ lacked substantial evidence to support his RFC assessment.  Accordingly, the Court finds Mr. Scardina's second assignment of error is without merit.

### VII.   Conclusion

For the foregoing reasons, the Court **AFFIRMS** the final decision of the Commissioner.


October 15, 2024


/s/*Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge